## COMMONWEALTH *vs*. NEAL F. SEVIERI.

Suffolk. December 13, 1985. — March 27, 1986.

Present: PERRETTA, KAPLAN, & FINE, JJ.

*Assault with Intent to Rape. Evidence,* Intent, Relevancy and materiality. *Practice, Criminal,* Argument by prosecutor, Sequestration of witnesses.

At the trial of an indictment for assault with intent to rape, the evidence presented by the prosecution in its case-in-chief, which included testimony as to the defendant's conduct shortly before the assault and as to his dragging the victim into her bedroom and trying to throw her on the bed, along with the absence of evidence of other motive, was sufficient for a jury to be convinced beyond a reasonable doubt that the defendant, at the time of the assault, possessed the intent to rape the victim, notwithstanding the absence of evidence of other activities usually indicative of an intent to rape. [752-753]

At the trial of an indictment for assault with intent to rape, in which the question to be resolved by the jury was the defendant's intent at the time he assaulted the victim, and where the prosecution's evidence on this issue was not overwhelming, the prosecutor's repeated statements during closing argument in which he urged the jurors to approach their deliberations from the victim's point of view and to consider their difficulty in explaining to their families a verdict for the defendant, presented a substantial risk of a miscarriage of justice, necessitating reversal of the defendant's conviction. [753-755]

In the circumstances of the trial of an indictment charging assault with intent to rape, it was within the judge's discretion to permit the prosecution to call a rebuttal witness to testify as to the defendant's conduct shortly before the alleged assault, as probative of his state of mind when he assaulted the victim. [755-756]

Denial of a criminal defendant's motion for sequestration of witnesses should be for reasons related to the particular case. [757]

INDICTMENT found and returned in the Superior Court Department on December 15, 1983.

The case was tried before *James P. Donohue,* J.

*William R. Hill, Jr.,* Committee for Public Counsel Services, for the defendant.

*William M. White, Jr.,* Legal Assistant to the District Attorney (*Michael J. Traft,* Assistant District Attorney, with him) for the Commonwealth.

PERRETTA, J. As will be seen from the evidence set out below, there is no real dispute that on November 6, 1983, about 3:00 A.M., the defendant entered the victim's dormitory apartment and assaulted and beat her. There are two primary issues on the defendant's appeal from his conviction of assault with intent to rape:[1] (1) the denial of his motion for a required finding of not guilty, Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979); and (2) the prosecutor's closing argument. Although we conclude that the evidence was sufficient to put the question of the defendant's intent to the jury, we reverse the conviction because of the prosecutor's appeal to the emotions and fears of the jurors.

1. *The Evidence.*

On Saturday, November 5, 1983, the football team of the college attended by the victim won its game, and parties were in order. One was held in an apartment on a floor above where the victim resided. It does not appear, however, that the victim was at the party.

We learn from the victim that she had an early morning breakfast with friends at their apartment across the hall from her own living quarters. After breakfast, the victim returned to her apartment, which she shared with three other women. Their unit consisted of a small kitchen, a livingroom, bathroom, and two bedrooms at the end of a hallway leading from the door to the apartment. When the victim arrived at her apartment that morning, she thought that none of the other women was there.[2]

---

[1] The jury found the defendant guilty of assault and battery. That conviction was placed on file with the defendant's consent and, therefore, is not before us. See *Commonwealth* v. *Delgado,* 367 Mass. 432, 438 (1975). Verdicts of not guilty were returned on indictments charging the defendant with assault with intent to murder and breaking and entering a dwelling house at night with intent to commit a felony.

[2] The victim testified that after the incident in question she discovered that one of the women with whom she shared the apartment was asleep in the second bedroom. This woman slept through the entire event.

As subsequent testimony reveals, the victim's roommate, whom we shall refer to as Mary, was visiting with friends in their apartment next door.

About 1:30 A.M., the victim went to bed. She was wearing underpants and a nightshirt of mid-thigh length. She fell asleep and did not awaken until the defendant came into the apartment. Apparently she slept soundly, because she did not hear Mary check in on her and close the door tightly as she returned to her friends. As explained by Mary, her actions were prompted by "all the people in the hallway and all the noise going on." Nor did the victim hear any of the commotion occurring almost directly outside her apartment door about 2:30 A.M.

There was testimony from Mary and Jane (the name we give to the next door neighbor with whom Mary was visiting) that at about 2:30 A.M. there were three males[3] in the hallway causing sufficient disturbance to attract four female residents, including Mary and Jane, to their doorways. Jane related that the defendant was acting in an "overt sexual manner." Specifically, he had a piece of wood, "like a long plank," which he was "pushing" between his legs. As he "straddled" the wood, he was "moving his body, like gyrations." His remarks, like his actions were sexual: "[H]e was saying to, generally, the women, that they, you know, they wanted it, they wanted to get laid. And he was using other foul terms." The women told the defendant that he was "disgusting." This incident lasted about five to ten minutes, after which the crowd dispersed. Mary returned with Jane to the latter's apartment, and the hall became quiet.

Very soon[4] after the incident in the hallway, the defendant entered the victim's apartment. When her bedroom light came

[3] Of the three men, the defendant was described as the shortest and oldest. The other two men appeared to be high school seniors or college freshmen. The defendant's driver's license was found in the victim's apartment. The license reveals that he is five feet, six inches tall and, on the date in question, was twenty-five years old.

[4] Taking the evidence in the light most favorable to the Commonwealth, we say "very soon" for the following reason. Testimony puts the hallway incident as completed by about 2:40 A.M. The victim testified that her

on, she awoke to see the defendant standing there. The victim sat up and demanded to know who he was and how he had gotten into her apartment. The defendant said that he had to use the bathroom. Angrily, the victim told him he could do so and "then you get out." When the defendant went into the bathroom, the victim got up, went to the door of her apartment, and held it open while she waited for him to come from the bathroom.

After the defendant came out of the bathroom, he refused to leave the apartment. The victim tried to push him out, but he grabbed her arm, put his hand over her mouth, and slammed the door shut. He told her that if she screamed, he would kill her. The defendant next pulled the victim's head back and dragged her across the floor back to her bedroom.

An athletic and lithe woman,[5] the victim struggled all the way, finally letting her knees buckle so that she and the defendant fell to the floor, "pretty much" on their knees. Her action was deliberate: she wanted to be on the floor and not the bed so that she could have greater leverage in her fight. The struggle was prolonged, but, according to the victim's testimony, at no time did the defendant touch her in a sexual, rather than a combative, manner.[6] For example, he continually smashed her face against the side of the bed but did not touch her breasts, which became exposed when, in the struggle, her nightshirt slid up almost to her neck. After the defendant had bested the victim by pinning her to the floor with his knee to her stomach, he neither straddled her nor attempted to remove his or her clothing. Instead, he choked her to the point that she became lightheaded, "losing what was happening," perhaps almost

struggle with the defendant lasted about forty minutes. Mary returned to the apartment at 3:30 A.M., about five to ten minutes after the struggle ended.

[5] A member of the school's women's rugby team, the victim is not quite five feet, ten inches in height, and on November 6, 1983, weighed about 125 pounds.

[6] The victim did testify that during the struggle the defendant brought his face close to hers. She stated: "I assume he tried to kiss me." However, upon the defendant's objection, the judge ruled, "That may go out. Just describe what you saw him do . . . ."

lapsing into unconsciousness. As he was choking her, the defendant stared directly ahead, not looking at the victim. She described him as "looking off, like he was not aware of my being underneath him or what he was doing to me."

Ultimately, the defendant allowed the victim to sit up. He continued to hold her by the neck as he related that he was not from the area, that there were people in the hallway who told him to come into her apartment,[7] that they were going to hurt him, and that he had to use her phone. The victim testified that he was "all upset that someone was going get him."

Plotting her escape, the victim told the defendant that if he would allow her to use the bathroom, she would "do anything" he wanted. When he said nothing, the victim got up and walked to the bathroom with the defendant following her. She walked slowly in order not to startle him. Reaching the bathroom, the victim went in and slammed and locked the door. The defendant banged on the door twice, shouting that he had to use the phone. Now hysterical, the victim screamed, "The phone's right there. Just get out of my apartment." The victim heard no one use the phone, and she remained locked in the bathroom for about five to ten minutes, when her roommate Mary returned from Jane's apartment.

Upon leaving Jane's apartment, Mary failed to shut the door tightly. As Jane was about to get ready for bed, the two young men whom she had seen earlier in the hallway came into her apartment. The men said that they just wanted to wash their hands and chat.[8] Jane allowed them to use the bathroom. She and her roommate chatted with them briefly, and they then asked the men to leave because they were tired and wanted to go to bed. Before the men could leave, the defendant "barged"

---

[7] Understandably, the victim's testimony as to the sequence of events during her combat with the defendant is not precise. She did relate that, at some point during their struggle, the defendant told her that his "friend said he had to come in here and start a party" with her.

[8] Jane explained that "earlier in the evening" a crowd which included these two men, was at a party which had spilled out into the hall and stairway. These two men had been sitting on the stairs and had a black substance, tar, "all over their hands."

into the apartment, and he was again using foul language. He went directly to the bathroom, where he took a damp cloth and applied it to his neck.

As Jane began to yell at the three men to get out, Mary returned. Jane described her as "furious," and she joined with Jane in getting the men out of the apartment. She and Jane then ran next door to the victim, who was crying and hysterical. Jane saw the three men standing in the hallway, and she ran out and snatched her facecloth from the defendant. When she did this, the victim screamed for her "to get back into the apartment." The campus police were called.

When the police arrived, the apartment door would not open, so Jane climbed out a window to walk around and open the door with a key. Once outside, she saw the defendant lying on the ground with the two younger men standing next to him. The college police officers were called to the area. They testified that the defendant had a minor laceration on his head.[9]

Testifying in his own behalf, the defendant related that on November 6, 1983, at about 1:10 A.M. he was driving a taxi. He picked up two young men who asked to be taken to the college dormitory. The men invited the defendant to join them at a party, and he agreed. At the party, the defendant drank five beers and three Kahlua sombreros. He followed two men whom he had met at the party downstairs, asking for directions to an exit. It was then about 2:20 — 2:30 A.M. They got on an elevator and the two men, who were intoxicated, were "being real rough," discussing a gun. Once off the elevator, the two men told the defendant that they would show him the way out. They began "trying doors to see if they were open." One of the men had a key. When he tried the key in the victim's door, it worked. He told the defendant, "Go on in. . . . Start a party,

---

[9] In considering the defendant's claim of entitlement to a finding of not guilty, we do not take into account his testimony or that of the Commonwealth's rebuttal witness. The Commonwealth's position did not deteriorate after it rested on its case in chief. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976); *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80 (1978). We set out the defendant's case, however, as it relates to his other allegations of error.

and we'll be right back. We're only going around to the next dorm."

Believing that the men wanted the defendant to enter the apartment, "turn on a radio or something, . . . see if anybody was there, and if there was a party going on," the defendant entered the apartment. Before the door closed, however, the defendant heard one of the men say to the other, "When that . . . comes out, . . . I'm going to kill him."

We need not relate the defendant's version of his encounter with the victim. It is sufficient to state that, although he admitted to grabbing her forcefully and shaking her, his purpose was to subdue her, explain his plight, and ask to use her phone. He did not drag her to the bedroom or try to throw her on the bed. He may have pushed her, but she stepped backwards into the bedroom and fell backwards, hitting the bed.

When the victim locked herself in the bathroom and refused to tell him where her phone was, notwithstanding his explanation of need, he left the apartment. Back in the hallway, he saw the men he feared. He feigned an injury in the hope that they would not hurt him, and he walked into another room and asked for a cold towel. He took the towel even though he was told not to do so, and returned to the hallway, where he was beaten by one of his assailants. He remembered nothing else until he awakened in a police car.

On cross-examination, the defendant could not recall any act in the hallway with a plank of wood or any offensive remarks on his part. Moreover, he denied behaving badly while at the party or bothering a woman who was present.

In rebuttal to the defendant's denial of any inappropriate behavior at the party, the Commonwealth called a woman who testified to being at the party. The defendant so bothered her with personal remarks that she left. He followed her until she reached a friend's room and slammed the door in his face. When she later returned to the party, the defendant again came over to her and said, "Let's go back downstairs because I want to get in you." The woman called to her friend, a defensive lineman for the football team, who escorted the defendant out of the room and downstairs.

2. *The Defendant's Intent.*

We think that the evidence presented by the Commonwealth in its case in chief was sufficient for a jury to be convinced beyond a reasonable doubt that, at the time the defendant began his assault on the victim, he possessed the intent to rape her. See *Commonwealth* v. *Nickerson,* 388 Mass. 246, 253-254 (1983). The standard by which we reach this conclusion is set out in *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979). See also *Commonwealth* v. *Clary,* 388 Mass. 583, 588 (1983), quoting from *Commonwealth* v. *Vellucci,* 284 Mass. 443, 445 (1933).

What makes application of the standard in this case difficult, and we acknowledge it to be so, is that there is an absence of that activity usually indicative of an intent to rape, such as casual conversation with the victim either before or after some stalking (see *Commonwealth* v. *Derby,* 263 Mass. 39, 43-44 [1928]; *Commonwealth* v. *Corcoran,* 332 Mass. 615, 616-617 [1955]; *Commonwealth* v. *Freeman,* 352 Mass. 556, 557-558 [1967]; *Commonwealth* v. *Mahar, ante* 307, 310 [1985]), or a grabbing or tearing of garments. See *Commonwealth* v. *Thompson,* 116 Mass. 346, 346-347 (1874); *Commonwealth* v. *Mattson,* 377 Mass. 638, 642 (1979); *Commonwealth* v. *Nickerson,* 388 Mass. at 247, 252.

There were, however, three facts which, in our view, required that the question of the defendant's intent be resolved by the jury. First, there was the defendant's conduct in the hallway, soon followed by his entry into the apartment. See note 4, *supra.* The defendant characterizes this evidence as giving rise to an "innuendo of a sexual state of mind" going to "behavior wholly unconnected" with the charge against him. If this incident had been remote in time or unaccompanied by the defendant's statement to the women in the hallway that "they wanted it, they wanted to get laid," his characterization might seem reasonable. But it was not "wholly unconnected." It must be viewed with all the circumstances. The second fact was that the defendant dragged the struggling victim back to her bedroom and attempted to throw her on her bed. The third circumstance was the "absence of evidence of other apparent

motive, such as larceny." *Commonwealth* v. *Rossi,* 19 Mass. App. Ct. 257, 261 (1985). See also *Commonwealth* v. *Mahar, supra* at 314.

From those circumstances, the jury could infer that, at the time the defendant dragged the victim into her bedroom and tried to throw her down on her bed, he intended to rape her. "The fact that the evidence did not require the jury to draw the inference . . . does not preclude the conclusion we have reached." *Commonwealth* v. *Nelson,* 370 Mass. 192, 203 (1976).

3. *Closing Argument.*

In his closing argument, the prosecutor directed to the jury remarks very similar to those made and found impermissible in *Commonwealth* v. *Harris,* 11 Mass. App. Ct. 165, 176 & n.9 (1981). Defense counsel timely objected, but the judge told the prosecutor, "Go ahead." We need not consider whether these impermissible statements constituted harmless error, because the subsequent statements of the prosecutor, reviewed under the "substantial risk of a miscarriage of justice" standard, leave little doubt that the conviction must be reversed:

> "What happens when he gets inside that door, and he forces that door open, and this girl is waking out of a dead sleep? *You place yourselves in that position — any of you women,* whether you live in a dormitory or an apartment, or a private home — you're without your husbands, your spouses; somebody breaks into your house at 3:30 in the morning, don't you have any terror in your heart? Wouldn't you be afraid to be alone with a man? . . . You think about that moment of fear.
>
> ". . . .
>
> ". . . 'Shut your mouth. Keep your mouth shut or I'll kill you right now. Don't you dare scream.' *You women place yourselves in that position.* How do you feel then?"
>
> ". . . .
>
> ". . .'He's got her by the throat. *Put yourself in that position,* when a man's got you by the throat, dragging

you into a bedroom, what do think? Who is the victim in that situation? . . ."

"He gets her in the bedroom . . . and of course, he would have you believe that the marks on her neck came from his watch. *Do you really want to go home tonight and tell your family,* 'I believe that is what happened: she had marks on her neck from his watch'?" [10] (emphasis added).

Rather than confess error, see, e.g., *Commonwealth* v. *Burke,* 373 Mass. 569, 575 (1977); *Commonwealth* v. *Hawley,* 380 Mass. 70, 82 (1980), the Commonwealth contends that these remarks were not an "attempt to inflame the jury" and that they were permissible, because, "[t]hat the female jurors may have had knowledge and experience which their male counterparts may not have shared does not mean their perspective should be ignored." The argument is more surprising than the remarks in issue. We think it unnecessary to explain, once again, the permissible limits of closing argument. Simply see *Commonwealth* v. *Earltop,* 372 Mass. 199, 205-206 & n.1 (1977) (Hennessey, C.J., concurring). *Commonwealth* v. *Harris,* 11 Mass. App. Ct. 176, published almost four years prior to the present trial, is particularly instructive on the flaws in the instant summation. As for the prosecutor's question to the jurors concerning what they would tell their families, we state for emphasis that we think it totally inappropriate to suggest to jurors that they may be required to explain their verdict to anyone, even family members.

These remarks were so prejudicial in nature as to require reversal. Jury instructions concerning credibility of witnesses, that the case must be decided on the evidence and not sympathies or prejudices, and that closing arguments are not evidence were standard, not curative. This is especially true of the *Harris*-type remarks, see 11 Mass. App. Ct. at 176 n.9, where defense counsel's objection was met with a green light to the prosecutor. To the more egregious remarks, quoted

---

[10] To this statement defense counsel objected, but, again, the prosecutor was told, "Continue . . . . Go ahead."

above, defense counsel did not object. We need not speculate whether he feared another "go ahead" to the prosecutor because, in our view, the error meets the "substantial risk of a miscarriage of justice" standard.

This is not a situation where the "argument was confined to collateral issues only, *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 316 (1973), wherein either overwhelming evidence of the defendant's guilt, or adequate curative instructions from the judge, might have rendered the prosecutorial misconduct harmless error. [Citations omitted.] Rather, the comments went to the very heart of the case. They struck, and struck impermissibly, at the defendant's sole defense . . . ." *Commonwealth* v. *Shelley,* 374 Mass. 466, 470-471 (1978). The evidence concerning the charge of assault and battery was overwhelming, and we have no concern respecting that verdict, even were it before us. See note 1, *supra.* But the evidence concerning the defendant's intention when assaulting the victim, although sufficient to withstand the defendant's motion for directed verdict, was not overwhelming. See *Commonwealth* v. *Clary,* 388 Mass. 583, 588-589, 594 (1983). This is so, even though the jury could well have rejected the defendant's testimony.

The crucial question to be resolved by the jury was the defendant's intent. They were told by the prosecutor to approach their deliberations, not as impartial evaluators of the defendant's remarks and actions, but from the victim's point of view. We are not even convinced that had defense counsel objected to these remarks and had curative instructions been given, the situation could have been remedied.

There were other remarks in the summation which the defendant challenges. Some of his claims are without merit. Others present cause for concern, especially when the summation is considered in its totality. However, as all these remarks have been scrutinized in previous decisions, in one context or another, we see no purpose to be served in discussing them. It should be understood by now that the closer the case, the more careful the summation must be.

4. *Evidence of Prior Conduct.*

When the Commonwealth indicated that it intended to call a rebuttal witness to contradict the defendant's testimony and

to show his state of mind in committing the crime charged, the defendant objected. His stated basis was simply that the witness should have been called during the Commonwealth's case-in-chief. He now argues that the evidence was irrelevant, highly prejudicial, and designed to show bad character and, hence, a propensity to commit the crime charged. As this argument is likely to arise at any retrial, we consider the defendant's claim.

Evidence of the defendant's conduct at the party is "admissible if 'substantially relevant to the offense charged; inadmissible when its relevance is insignificant; and, in borderline cases, admissible when its relevance outweighs the undue prejudice that may flow from it . . . .' *Harper* v. *United States,* 239 F.2d 945, 946 (D.C. Cir. 1956), quoted in *Commonwealth* v. *Deschamps,* 1 Mass. App. Ct. 1, 2-3 (1972)." *Commonwealth* v. *Yelle,* 19 Mass. App. Ct. 465, 472 (1985). The defendant's behavior at the party could be viewed as consistent with his conduct in the hallway. Both events were very close in time to his assault upon the victim and, in our view, probative of his state of mind at that crucial time. See generally Liacos, Massachusetts Evidence 420 et seq. (5th ed. 1981 & 1985 Supp.). In this respect, the "prosecution was entitled to present as full a picture as possible of the events surrounding the incident itself." *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269-270 (1982). See *Commonwealth* v. *Banker, post* 976, 977 (1986), and cases therein cited.

Because the evidence has probative value, the question is whether that value is outweighed by undue prejudice. Such a determination is a matter within the trial judge's discretion. Here, the trial judge was not called upon to exercise that discretion because of the grounds of the defendant's objection. However, had he been required to resolve the issue of probative value versus undue prejudice, we would not have concluded on this record that he had abused his discretion in allowing the testimony in evidence. Because we cannot predict what the evidence will be at any retrial, or the timing or manner of its offer, we do not suggest that the trial judge will not be free to exercise his or her discretion on the issue.

5. *Sequestration of Witnesses.*

In denying the defendant's motion to sequester witnesses, the trial judge explained that in his opinion the "courtroom is an open place and people should be permitted, and indeed, encouraged, to sit through the entire trial." He invited defense counsel to renew his motion at any time "you think that something is happening." As a similar motion may be made at any retrial, we consider the defendant's claim.

Although we see a distinction between the general public and witnesses when encouraging attendance throughout trials, whether witnesses will be sequestered is a matter within the discretion of the trial judge. See *Commonwealth* v. *Gogan,* 389 Mass. 255, 261 (1983); Mass.R.Crim.P. 21, 378 Mass. 892 (1979). However, we think that to deny such a motion as a matter of practice rather than for reasons related to the particular case presents unnecessary problems on any appeal.

*Judgment reversed.*

*Verdict set aside.*