## Commonwealth *vs.* Marc Brown.*

No. 97-P-2112.

Suffolk. November 4, 1998. - February 4, 1999.

Present: Warner, C.J., Kaplan, & Brown, JJ.

*Evidence,* Tape recording, Hearsay, Spontaneous utterance. *Practice, Criminal,* Comment by prosecutor, Sentence. *Home Invasion. Statute,* Construction.

At the trial of indictments for home invasion, breaking and entering with intent to commit a felony, assault and battery, assault by means of a dangerous weapon, threats, and malicious destruction of property, the judge properly admitted in evidence under the spontaneous utterance exception to the rule against hearsay, and allowed the jury to hear, an authenticated police audiotape of six "911" telephone calls made contemporaneously with the incident by the victims' neighbors; in any event, given the Commonwealth's other strong evidence, the defendant suffered no prejudice from the admission of the tape. [281-283]

At the trial of indictments, the prosecutor's isolated improper remark in closing argument and her other hyperbolic statements did not, in light of the case as a whole, create a substantial risk of a miscarriage of justice. [283]

A defendant's sentence of commitment from twenty years to twenty years and one day, after conviction of home invasion, G. L. c. 265, § 18C, inserted by St. 1993, c. 333, was lawful. [283-285]

INDICTMENTS found and returned in the Superior Court Department on September 19, 1996.

The cases were tried before *Nonnie S. Burnes,* J.

*Edward B. Gaffney* for the defendant.

*Mark T. Lee,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. In this jury-tried case, the Commonwealth's evidence went as follows. Laurie Surface lived at 30 Falcon Street, East Boston, with her two children, her boyfriend Jerry Mazziotta, Mazziotta's sister Sylvia Lopez, and Lopez's six children. In summer 1996, Surface borrowed sixty dollars from the defendant Marc Brown to tide her over a lapse in welfare assistance (the defendant testified it was money for drugs).

_____

* After a rehearing on the issue of sentencing, the court issued a further opinion, reported in 47 Mass. App. Ct. 616 (1999). — REPORTER

Surface was gradually repaying the loan but toward the end of August was still short twenty dollars.

It was agreed the defendant would come to the house in early morning on August 26 and receive payment from Mazziotta and drive him to work. On the day, the defendant telephoned and then came to the house, but Surface and Mazziotta were asleep. He roused them by repeatedly ringing the doorbell, only to be told that they didn't have the money but would have it later in the day. Surface was annoyed to be waked with the children at 6:00 A.M.; the defendant was angry that Surface had failed him again.

After palaver, Surface escorted the defendant out of the house. As she reentered, she heard a shattering noise from her bedroom fronting the first floor.

The defendant had jumped through the bedroom window with a tire iron in his hands and ripped the telephone from the wall. Surface told Mazziotta to go call the police and he did so, leaving Surface, Lopez, and the children in the apartment. Surface, recalling there was a baseball bat under her bed, dived for it; as she stood up, the defendant hit her in the head with the tire iron, then struck her at least four more times on the head and several times on her arm and leg, and punched her repeatedly. Surface's ten year old Michael, seeing the defendant attack his mother, tried to push the defendant away; the defendant threw him on the bed, struck his foot with the tire iron, and punched him. The fracas spilled into the parlor where the children had been sleeping. Lopez's son Robert, ten years old, tried to protect Surface. The defendant, said Surface, "punched [Michael and Robert] and hit them like they were men." At last, the defendant dropped the iron; Surface managed to grab it and hit the defendant on the arm; by this time she was dead tired and clung to the defendant's shirt to keep from falling. The defendant seized Michael by the throat and said "that we were all going to die and he was going to take my son with him." Now the defendant's wife came through the broken window and drew the defendant and herself out of the apartment that way.

There were injuries all around; Surface had a fractured skull.

Surface, Michael, and Jerry and Robert Mazziotta testified for the Commonwealth and told the foregoing story in fuller detail. The Commonwealth also put in evidence (over objection, as will appear) and played to the jury a police audiotape register-

ing six "911" telephone calls from neighbors at separate vantage points recounting observations of parts of the criminal episode.

For the defense, the witnesses were the defendant and his wife. They claimed Jerry Mazziotta pulled the defendant through the window; a general fight took place with Surface, Jerry Mazziotta, and the defendant flailing about; and Mazziotta, not the defendant, wielding the tire iron, chanced to hit Surface.

The jury could well believe the Commonwealth's evidence. They convicted the defendant of seven of the eleven charges of the indictments, as noted in the margin.[1]

On appeal, the defendant contends there was error in admitting the audiotape; the prosecutor's closing speech was beyond proper bounds of advocacy; and, in respect of the home invasion count, the judge pronounced sentence under the erroneous belief that she did not have discretion to name less than a minimum of twenty years.

1. Authenticated by the keeper of such tapes for the Boston police department, the audiotape records the six calls from 6:29 to 6:32 A.M. In the margin we set out as typical the first and second calls of the five offered by the Commonwealth.[2]

The defendant's objection to the offered calls was on the

---

[1]The defendant was convicted of home invasion; breaking and entering with intent to commit a felony; one count of assault and battery; two counts of assault by means of a dangerous weapon; threats; and malicious destruction of personal property. He was acquitted on two counts of assault and battery; assault by means of a dangerous weapon; and assault and battery on a child under fourteen.

The judge sentenced the defendant to from twenty years to twenty years and one day on the home invasion conviction; from three to five years on the assault by means of a dangerous weapon, to run concurrently; five years' probation on the breaking and entering and assault and battery by means of a dangerous weapon, to run from and after his incarceration. The convictions of assault and battery, threats, and malicious destruction of personal property were placed on file at the defendant's request.

[2]First call, beginning 6:29 A.M. Caller: "30 Falcon. A black man beat up a woman with a crow bar." Operator: "OK. Out front?" Caller: "All over the place." Operator: "All over the place?" Caller: "Screams, everything. Hurry, please." Operator: "I will, I will." Caller: "He's in a car with a U-Haul trailer. License plate T [inaudible] 7, 763 XBH [inaudible]."

Second call, beginning 6:29:40 A.M. Caller: "I got an emergency at 30 Falcon Street. I just seen somebody jump in the lady's window across the street." Operator: "30 Falcon?" Caller: "30 Falcon. Yeah. He broke the window and just jumped in." Operator: "What floor? Is it a single family?" Caller: "Three family, and I know there's kids that live there." Operator: "All

ground of hearsay, as the callers were not brought in to testify. The Commonwealth does not attempt to justify on the basis of the "business records" exception to the hearsay rule, the ground mentioned by the judge; rather the Commonwealth says the calls were admissible under the "excited utterance" exception, and, "if the evidence is admissible, 'it is of no consequence whether the reason assigned by the judge was accurate.' " *Commonwealth* v. *Signorine*, 404 Mass. 400, 403 n.1 (1989), quoting from *Mathews* v. *Orlandella*, 320 Mass. 386, 388 (1946). We agree this exception, as latterly formulated in the decisions, applies to the present facts. "A statement made under the impulse of excitement or shock is admissible if its utterance was spontaneous to a degree that reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize, or explain the underlying event." Liacos, Massachusetts Evidence 516 (6th ed. 1994). *Commonwealth* v. *Brown*, 413 Mass. 693, 695-696 (1992). Calls not unlike the present have qualified for admission in *Commonwealth* v. *Giguere*, 420 Mass. 226, 233-234 (1995), and *Commonwealth* v. *Smith*, 35 Mass. App. Ct. 655, 664 (1993). We add there is no requirement as a condition of admissibility that the caller be unavailable to testify as a witness. See Liacos, Massachusetts Evidence 519-520.[3]

Even granting the general pertinence of the exception, says the defense, some of the statements in the calls were not admissible because the voice heard is not that of the person who actually made the observation. This is not correct. There is background conversation but the voice that comes through

right. Listen to me. Which floor is he on?" Caller: "Um, the first floor." Operator: "White guy, black guy?" Caller: "Huh? Black man." Operator: "All right. Did he break in the window in the front, the rear, what?" Caller: "Yeah, it's the front. He broke the window and I seen him go in and she was screaming outside."

After the Commonwealth played the first two minutes of the tape (five calls), defense counsel renewed his objection to the evidence. When this objection was overruled, counsel asked that the prosecutor play the rest of the tape (the sixth caller said 30 Falcon Street "has had a lot of calls for crack"). Following the 911 calls, the tape played some radio conversations among the responding police officers, largely inaudible, with long pauses between exchanges.

[3]Citing Massachusetts case law and Fed.R.Evid. 803(2), and noting there is no difficulty with the confrontation clause, see *White* v. *Illinois*, 502 U.S. 346, 353-358 (1992).

See Fed.R.Evid. 803(1) about "present sense impressions," an exception close in design to 803(2) and applied in *United States* v. *Mejia-Velez*, 855 F. Supp. 607, 613 (E.D.N.Y. 1994), to admit a 911 call.

evidently is that of the percipient person. (For further assurance on the point we have listened to the tape in addition to reading the transcript.) However, it seems to us the exception would hold if, say, the observing person at the window spoke out what she saw and a nonobserver at the telephone in the room repeated the substance of what the first said, serving as a kind of echo. Cf. *Commonwealth* v. *Williams*, 399 Mass. 60, 68-69 (1987).

If, perchance, admission of the calls were finally held to have been in error the question would be "whether the defendant's case was significantly weakened [by the admission] so as to entitle him to a new trial," *Commonwealth* v. *Magraw*, 426 Mass. 589, 599 (1998); there must be a new trial unless "the jury could not have been influenced by the erroneously admitted evidence." *Id.* at 599-600. We doubt a case could be made for a new trial. The other evidence is so strong that the calls seem merely cumulative in their effect.

2. In *Commonwealth* v. *Sevieri*, 21 Mass. App. Ct. 745, 753-755 (1986), a rape case, the prosecutor asked the women jurors to imagine their terror if they were being attacked by the defendant. We thought this preyed on the women's fears of being sexually attacked and was improper. The prosecutor's remark in the present case, asking the jury to imagine themselves in the house during the attack ("Can you imagine the moment of being inside that home? This guy has a tire iron and he is walking around swinging it and hitting people") was a rather paler exhortation than that in *Sevieri*, and it was only a brief, isolated remark. Still, it could easily have been dispensed with. The remarks that the defendant was a "raving maniac" who "terrorized" those inside the house were hyperbolic statements but not very far removed from the truth of the defendant's behavior; yet they would have better been toned down. As the defense did not object to the prosecutor's speech, we have to consider, in light of the case as a whole, whether it created a substantial risk of a miscarriage of justice, see *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967); *Commonwealth* v. *Sevieri, supra* at 755, and we conclude that it did not. It was more nearly " '[e]nthusiastic rhetoric, strong advocacy, and excusable hyperbole' . . . not grounds for reversal." *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998), quoting from *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997).

3. The home invasion statute, G. L. c. 265, § 18C, inserted by St. 1993, c. 333, states in part:

"[An offender] . . . shall be punished by imprisonment in the state prison for life or for any term of not less than twenty years."

He who runs will read these words as describing a statutorily-prescribed minimum sentence in the common understanding, that is, as leaving the judge without discretion to sentence to State prison for a lesser term of years. Indeed, so these words in the instant statute have been read by us in *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58, 62 (1997), and like words in another statute were so read in *Commonwealth* v. *Claudio*, 418 Mass. 103, 109 (1994).[4] Cf. *Commonwealth* v. *Maracic*, 18 Mass. App. Ct. 722, 724 (1984).

The defendant, however, proposes variant interpretations or conclusions. (a) The judge, he says, could have chosen to sentence him to a house of correction, and under parole board regulations he would then become eligible for parole in two years, rather than after twenty. Here the defendant refers to G. L. c. 279, § 31, apparently conferring such a general discretion in sentencing, discussed in *Commonwealth* v. *Hayes*, 372 Mass. 505, 511-512 (1977). Whatever may have been the situation under § 31, that statute was repealed by § 18 of the Truth-in-Sentencing Act, St. 1993, c. 432, effective July 1, 1994 (see St. 1993, c. 432, § 21), before the present defendant committed the offense.

(b) Just following the provision of the house invasion statute above quoted laying down the twenty-year minimum, G. L. c. 265, § 18C, speaks of second offenses:

"The sentence imposed upon a person who, after having been convicted of violating any provision of this section, commits a second or subsequent offense under the provisions of this section shall not be suspended or placed on probation."

---

[4] Although those cases refer to the "not less than" language as creating a mandatory minimum sentence, such a sentence is mandatory in the sense that a judge is required by statute to impose it as a minimum term, as compared to an actual mandatory minimum sentence which by statute must be served in full without reduction, with no eligibility for parole or deductions for good conduct. See *Commonwealth* v. *Marcus*, 16 Mass. App. Ct. 698, 699 n.1, 702 (1983). The Truth-in-Sentencing Act has in effect eliminated much of this distinction (see discussion, *infra*) except that for the "not less than" type sentence deductions are still permitted under G. L. c. 279, § 129D. See G. L. c. 127, § 133, as appearing in St. 1993, c. 432, § 11.

This could suggest that upon a first offense — which is the present case — the judge may suspend or place on probation, and G. L. c. 279, § 1 (as appearing in St. 1975, c. 347), gave general authority to the court, upon sentencing a person to imprisonment, to "direct that the execution of the sentence, or any part thereof, be suspended and that he be placed on proba-' tion for such time and on such terms and conditions as it shall fix." But if a judge is given such discretion, she must, so the defendant reasons, also have leeway to sentence for less than the twenty years for home invasion. Again, the Truth-in-Sentencing Act interposes. The statute, G. L. c. 279, § 1, has not been repealed, but by § 11 of St. 1993, c. 432, a parole statute, G. L. c. 127, § 133, has been amended (effective July 1, 1994, see St. 1993, c. 432, § 21) to require that persons sentenced to State prison serve the minimum term of their sentence before possibility of parole, and the final sentence of the amended parole statute now reads: "Sentences of imprisonment in the state prison shall not be suspended in whole or in part." See *Commonwealth* v. *Russo*, 421 Mass. 317, 319 n.2 (1995). Judges can still suspend house of correction sentences.

*Judgments affirmed.*