## COMMONWEALTH vs. KEVIN P. DAVIS, JR.

No. 00-P-700.

Middlesex. November 19, 2001. - May 17, 2002.

Present: PORADA, GRASSO, & DOERFER, JJ.

*Evidence,* Spontaneous utterance, Fresh complaint, Corroborative evidence, Cumulative evidence. *Practice, Criminal,* Comment by judge.

At the trial of indictments charging rape and indecent assault and battery, the judge properly admitted as spontaneous utterances certain statements made by the victim, in the presence of several witnesses, before the arrival of police officers, where the victim was described by the witnesses as being upset to the point of being frantic, hysterically crying, screaming, and hyperventilating, and the victim's testimony corroborated that description, and where the victim made the statements explaining the startling event within minutes of the incident. [761-762]

At the trial of indictments charging rape and indecent assault and battery, the judge properly ruled that statements made by the victim on cross-examination that she was in a composed state when she spoke to police officers after they had arrived on the scene did not foreclose the judge's finding from all the evidence that the victim was still under the sway of the traumatic event and that her statements were otherwise made in circumstances that made them admissible as spontaneous utterances. [762-763]

At the trial of indictments charging rape and indecent assault and battery, the judge did not abuse his discretion in admitting a cumulation of evidence as spontaneous utterances, where the victim's immediate reaction to the events was legitimately used by the Commonwealth as highly probative evidence that she had not consented to sexual conduct with the defendant, and that penetration had occurred; and where defense counsel had the opportunity to challenge the victim vigorously on whether she had said anything about penetration, and his questions suggested she had not. [763-764]

At the trial of indictments charging rape and indecent assault and battery in which fresh complaint evidence was admitted that was cumulative of abundant evidence already admitted substantively but which also served the function of rebutting a supposed negative inference of the victim's failure to make hue and cry, the judge's admission of these additional statements of the victim was harmless error where, even assuming they were impermissibly used by the jury as substantive evidence, they were merely cumulative of multiple other permissibly admitted statements of the victim, as well as her direct testimony. [764-765]

At the trial of indictments charging rape and indecent assault and battery, remarks by the judge to the jury mistakenly suggesting that the prosecutor had improperly referred to underreporting of rape as a social problem and that the jury should reward the victim for having the courage to report the alleged rape, which remarks were later explained by the judge's additional remarks requiring the jury to decide the case on the proven facts and not on extraneous considerations, did not harm the defendant. [765-767]

INDICTMENT found and returned in the Superior Court Department on September 19, 1997.

The case was tried before *Thayer Fremont-Smith*, J.

*Steven J. Rappaport* for the defendant.

*Afton M. Templin*, Assistant District Attorney, for the Commonwealth.

DOERFER, J. The defendant was convicted by a jury of digital rape and indecent assault and battery. The issues at trial were consent and penetration. On appeal the defendant claims, in substance, that certain extrajudicial statements qualified only as fresh complaints and not as excited utterances, and thus should have been limited in number and effect. He also claims that he was deprived of a fair trial because there was a combined "piling on" of extrajudicial statements that were admitted as either excited utterances or fresh complaints. We affirm.

*The evidence at trial.* The defendant and Alice[1] had encountered each other while socializing with mutual friends and acquaintances at several drinking establishments on the evening in question. At trial the defendant claimed that his initial social encounter with Alice that evening was much more of a positive experience than was claimed by her. The defendant, Alice, and a number of others in this group ended up at the home of Michael, a cousin of Alice.

It was not disputed that Alice, the defendant, and his friend, Christopher Estepp, were together in the first floor living room in the early morning hours. Michael and Suzanne, a friend of Alice, went upstairs to Michael's bedroom. Christopher Johnston, who was one of Michael's roommates, went to his bedroom on the second floor, alone. Todd Ehwa, Michael's other roommate, was initially in the living room but left the

[1] A pseudonym.

apartment to go to a party. There was a dispute at trial as to what happened next on the issues of consent, penetration, and assault.

According to the testimony of Alice, while waiting for her friend Suzanne to come down from upstairs so she and Suzanne could go home, she fell asleep in the living room on a commodious couch where Estepp was also asleep. The defendant was asleep on the floor. She was awakened by the force of the defendant's fingers inserted in her vagina. Estepp was no longer on the couch. The defendant was kneeling on the floor next to her, leaning over her with his mouth on her exposed left breast. His hand was shoved up the right side of her loosely fitting shorts. Her shirt and bra had been undone. She pushed the defendant away and said, "Don't," turned away from him and covered her chest with her arms. He persisted and shoved his hand up the back of her shorts and grabbed her upper thigh but was unable to again penetrate her vagina with his fingers. She was frightened and in shock and screamed, "Stop it," and pushed him away. The phone rang and she leapt up to answer it. As she did, she testified that the defendant grabbed her arm to try to stop her from getting off the couch, leaving bruises on her upper arm. It was Todd Ehwa on the phone, looking for a ride home. Alice pleaded with him to come home immediately. She then testified to her actions of running up the stairs, screaming, speaking to Michael, and rousing the rest of the house to chase the defendant out.

The defendant testified that he woke up from sleeping on the floor when Estepp stepped over him. He said he got on the couch where he and Alice had a consensual encounter, kissing and caressing. He began removing her shirt and bra. He stopped when Alice said, "Stop it." He denied penetrating her vagina with his fingers. The defendant also denied grabbing Alice as she was answering the phone.

The defendant's friend, Estepp, testified, in substance, that when he woke up while on the couch with Alice, he noticed that she was sleeping and the defendant was on the floor next to the couch. He woke up a second time and went over to a larger couch. He woke up again, coughing. As he did he heard Alice say, "Stop it." He sat up and saw the defendant sitting up while

Alice was still sleeping on the couch. Estepp said, "What's up," and got no response. He left to go to the bathroom and returned a minute or two later, sat on a chair and smoked a cigarette. When he had nearly finished the cigarette, Alice got up off the couch screaming and yelling, "What did you do? I can't believe you did that," and ran upstairs.

*The extrajudicial statements.* Michael testified that when Alice ran up the stairs she spoke to him, crying and hysterical, saying, "He took my blouse off," referring to the defendant. Michael got Johnston, and the two of them got the defendant out of the house. As the defendant was leaving Alice came running out, hysterical and hyperventilating and screaming at the defendant, and hit him in the face. Michael testified that she said, "Why'd you do this to me? Why'd you do this to me?"

Johnston was awakened by Michael coming into his room. He testified that he heard Alice screaming, "I can't believe he would do this to me. He had my shirt off." He also related that as the police arrived she kept yelling and screaming, "I can't believe he did this to me," and "It was [the defendant]." He said the police arrived about four to five minutes after he first heard Alice scream.

Suzanne, who was in Michael's bedroom, testified that Alice burst in crying and hysterical and stated that "[h]e had his hands up my shorts. He had his fingers inside of me. . . . He had his mouth on me." After Michael went to chase the defendant, Alice repeated these things to Suzanne in the bedroom before going downstairs and added, "I was sleeping. He was — I woke up. His fingers were inside me. I pushed him away. I told him to stop." Suzanne also testified to the statements of Alice as she ran out of the house and confronted the defendant, similar to the account given by Michael. Suzanne added that, after the defendant left, Alice continued to scream, "I can't believe this happened. Why would he do this to me? . . . He had his mouth on me. He had his hand up my shorts."

Officer Brian Gill of the Ayer police department testified that he arrived at the scene at 4:54 in the morning and saw four or five people standing in the driveway. He observed Alice to be kneeling or crouching, hysterical and yelling. Over objection he testified that she was screaming, "I can't believe he did this to

me, he had his fingers in me." He then left and eventually apprehended the defendant. He was extensively cross-examined on the veracity of his testimony as to Alice saying that she had been penetrated.

Officer Jolene Minardi testified that she arrived at the scene in response to a dispatch, as did Officer Gill, in a separate vehicle. Minardi observed Alice lying on the asphalt in front of the house with Estepp leaning over her. She was crying, screaming, and hysterical. Minardi caught bits and pieces of what she was saying, such as "He touched me. Why? His fingers in me." Her voice was "[h]igh pitched, screaming, and then she would come down to kind of moan and whimper, cry." Her breathing was "hitching and gasping" as if "she couldn't catch her breath." When Minardi approached and asked what was going on, Alice said that she had been touched while sleeping.

Minardi took Alice into the house, accompanied by Suzanne. They were joined by Alice's former boyfriend. Minardi asked Alice what happened. Alice was still hysterical, having difficulty speaking and breathing. She told Minardi essentially the same things that she testified to at trial. When Minardi told her that these events constituted rape, Alice became even more upset.

The testimony given by the former boyfriend as to what the victim said to Minardi inside the house was substantially the same as the testimony given by Suzanne and Minardi.

All of the foregoing testimony was admitted, without limitation, as excited utterances.

Two additional extrajudicial statements of Alice were admitted as fresh complaints. Minardi testified to statements made by Alice to her a few days after, which were substantially similar to the statements made on the night in question. An appropriate limiting instruction was given by the judge.

A man who was the employer of Alice at the time testified, over objection, that when Alice came in to work the day after the incident, she related to him what had happened during the previous night: that she laid down on a couch, next to Estepp; that she fell asleep and awoke feeling a pain in her vagina and something on her breast; that she pushed away and realized that the defendant was there; that the defendant put his fingers

underneath her shorts; that she heard the telephone ring, got up, was grabbed by the defendant by her arm; and that she ran upstairs to her cousin.

*The admissibility of Alice's statements as excited utterances.* All of the statements made on the evening in question were made within a short time of the event. All of the witnesses to these statements testified to Alice's demeanor and mental state as, to a greater or lesser degree, screaming, shouting, hyperventilating, hysterical, sobbing, and the like. The defendant's arguments are different, however, for the statements made by Alice before the police arrived and after they arrived.

*Statements made before the police arrived.* The statements Alice made after she ran upstairs were first objected to on the grounds that they were fresh complaints and should be so limited. Evidence which is otherwise admissible as a spontaneous utterance might also qualify as a fresh complaint. But where a proper foundation is laid, a declarant's statement (reporting a sexual assault) may be admitted "under the rubric of spontaneous utterance, rather than fresh complaint." *Commonwealth* v. *McCutcheon*, 51 Mass. App. Ct. 715, 720 (2001). See *Commonwealth* v. *McCormick*, 48 Mass. App. Ct. 106, 110 (1999) ("As an immediate or contemporaneous complaint, [a spontaneous utterance is] a specially reliable and deeply-rooted hearsay exception," citing several cases recognizing the conceptual distinction between spontaneous utterances and fresh complaint in sexual assault cases). For example, in *Commonwealth* v. *Fuller*, 399 Mass. 678, 682-683 (1987), the statements of a child victim of sexual assault, which were admitted into evidence as an excited utterance, clearly would also have qualified as fresh complaint. See *Commonwealth* v. *Rivera*, 397 Mass. 244, 248 (1986), where the court noted that prior statements of a victim of sexual assault that identified the defendant could be admissible as an excited utterance even if the victim's out-of-court statement was not admissible under *Commonwealth* v. *Daye*, 395 Mass. 55, 58-62 (1984). If the out-of-court statement is admissible as an excited utterance, it is not subject to the limitations on statements that only qualify as fresh complaint. The reason for restricting the amount of fresh complaint evidence that is not a spontaneous utterance is that fresh

complaint evidence may not be used for substantive purposes but only as corroboration. *Commonwealth* v. *Lavalley*, 410 Mass. 641, 646 (1991). Thus, the excessive use of fresh complaint evidence is circumscribed to minimize the chances of its misuse as substantive evidence. *Commonwealth* v. *Licata*, 412 Mass. 654, 659-660 (1992). *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 761 (1995). Here, those statements were properly used as substantive evidence, not just as corroboration.[2]

The statements Alice made in the presence of Michael, Suzanne, and Johnston prior to the arrival of the police were clearly admissible as excited utterances. See *Commonwealth* v. *King*, 436 Mass. 252, 254 (2002). There was more than adequate evidence on the record to satisfy the basic predicates for admission of Alice's statements as spontaneous utterances, i.e., that there was an exciting or startling event that caused a high degree of excitement in the declarant and that the statements were made while under the stress or influence of the exciting event and before the declarant had time to fabricate. The witnesses universally described Alice as being upset to the point of being frantic, hysterically crying, screaming, and hyperventilating, and Alice's testimony corroborated that description. See *Commonwealth* v. *Snell*, 428 Mass. 766, 777 (1999); *Commonwealth* v. *Kirk*, 39 Mass. App. Ct. 225, 227-228 (1995). Further, Alice made the statements within minutes of the event. *Commonwealth* v. *Snell*, 428 Mass. at 777. The statements explained the startling event. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 286 (1990); *Commonwealth* v. *Nunes*, 430 Mass. 1, 4 (1999); *Commonwealth* v. *Hardy*, 47 Mass. App. Ct. 679, 682 (1999).

*Statements made after the police arrived.* The defendant next challenges the admission of statements attributed to Alice after she went downstairs and met the police, on the ground that Alice admitted on cross-examination that she had calmed down by that time. Alice was called as a witness by the Commonwealth, after Officer Gill, Johnston, and Michael had testified.

---

[2]We do not suggest that the test for admitting an excited utterance is at all relaxed in circumstances involving a complaint of rape or sexual assault. Nor do we mean to say that the distinction between excited utterances and fresh complaints should be blurred.

When cross-examining Alice, defense counsel asked a series of leading questions to try to bring out that Alice had calmed down somewhat by the time the police arrived. Alice agreed that she was not "absolutely hysterical and frantic any more," and the following exchange occurred.

> Q. "By the time that you went outside to greet the officers, certainly with the time that had passed since the incident, you now had the ability to reflect upon what was happening or what had happened?"
>
> A. "Yes."

Before Alice testified, however, Officer Gill and Johnston had already testified to the demeanor and actions of Alice while she made statements in their presence. The judge admitted Alice's statements through Gill and Johnston before having the benefit of Alice's "admission" that she was in a composed state. After Alice testified, the defendant explicitly objected to the admission of further excited utterances by Alice on the ground that Alice herself now admitted she was not in a state of mind that would permit such evidence to come in.

The trial judge was not, however, bound to take Alice's assessment of her state of mind as the final word on the subject. The judge had heard other witnesses describe her as hysterical, crying, hyperventilating, and the like, which provided more than sufficient basis for him to rule that her statements qualified as excited utterances. The judge properly ruled that her statements on cross-examination did not foreclose the finding from all the evidence that she was still under the sway of the traumatic event and that her statements were otherwise made in circumstances that made them admissible as excited utterances.

*The cumulation of excited utterance testimony.* Evidence that is admissible as an excited utterance comes in as substantive evidence, see *Commonwealth* v. *Snell*, 428 Mass. at 777, not merely as corroboration, as is the case for fresh complaint evidence. Thus, claims that an excessive amount of such evidence was admitted will be examined under general principles governing the judge's discretion on matters of cumulative evidence, and not on the arguably more stringent

basis of limiting the number of fresh complaint witnesses to avoid "piling on" and the possible improper use of evidence, which is only corroborative, for substantive purposes.

Generally the admission of cumulative evidence does not constitute reversible error. *Commonwealth* v. *Bart B.*, 424 Mass. 911, 915 (1997). Furthermore, the prejudicial effect of cumulative spontaneous utterance evidence is mitigated where the person who made the out-of-court statements testifies at trial and is subject to cross-examination about her prior statements. See *Commonwealth* v. *Whelton*, 428 Mass. 24, 27 (1998) (no reversible error even where hearsay statements were inadmissible as excited utterance but merely cumulative).

Here there was no abuse of discretion. Alice's immediate reaction to the events was legitimately used by the Commonwealth as highly probative evidence that she had not consented to the sexual conduct with the defendant, and that digital penetration had occurred. Her cousin, her cousin's roommate, and her friend were all on the scene at the time of the events. Although they did not witness the actual sexual assault they were eyewitnesses to the rapidly unfolding events. For the jury to accept the excited utterance testimony they first had to believe that Alice said the things she did. The defendant's attorney challenged her vigorously on whether she had said anything about penetration and his questions suggested that she had not. In these circumstances the judge was well within his broad discretion to permit the Commonwealth to bring all available evidence to bear in order to carry its burden on the essential and contested issues of the trial.

*Fresh complaints on top of excited utterances.* More problematic are the statements made by Alice the next day, which did not qualify as excited utterances, but did qualify as fresh complaint.[3] Fresh complaint evidence is admitted primarily because the absence of testimony that a sexual assault victim complained or spoke out may lead the fact finder to draw the unreasonable inference that a victim who does not complain soon after the event may not be telling the truth. *Commonwealth* v. *Lavalley*, 410 Mass. at 643. See *Commonwealth* v. *Bailey*,

---

[3]The defendant makes no argument that, but for piling on, these statements did not qualify as fresh complaint evidence.

370 Mass. 388, 392-396 & n.7 (1976) ("hue and cry"). The excited utterances in this case, however, all served not only to supply substantive evidence but also to corroborate Alice's in-court testimony as fresh complaints. Thus, there was abundant evidence that, immediately during and after the event, Alice made vociferous and immediate complaints about what had happened to her, but those statements were properly admitted without limitation as excited utterances. In these circumstances the rationale for receiving additional fresh complaint evidence is hard to justify. It was cumulative of evidence already admitted substantively but which also served the function of rebutting the supposed negative inference of a failure to make hue and cry.

Viewed as cumulative "hue and cry" evidence, it takes its place at the end of the line of the other statements made by Alice that also served this function, and it would have been better to exclude it. However, even if an abuse of discretion, the admission of these last two statements was harmless error. See *Commonwealth* v. *Bailey*, 370 Mass. at 393. We are confident "that the error did not influence the jury, or had but very slight effect. . . ." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). Assuming it was impermissibly used by the jury as substantive evidence it was merely cumulative of multiple other permissibly admitted statements of Alice, as well as her direct testimony. See *Commonwealth* v. *Quincy Q.*, 434 Mass. 859, 869 (2001). Compare *Commonwealth* v. *Esteves*, 429 Mass. 636, 638-639 (1999). We have noted that the admission of even a fulsome number of fresh complaints does not inexorably lead to reversible error. See *Commonwealth* v. *Loren-zetti*, 48 Mass. App. Ct. 37, 42 (1999).

*Other issues.* The defendant argues that a remark made by the trial judge during the jury's deliberations invaded the province of the jury and entitles him to a new trial. The episode began when the trial judge suggested mistakenly to the jury that the prosecutor had improperly referred to underreporting of rape as a social problem and that the prosecutor suggested that the jury should reward Alice for having the courage to report this alleged rape. In fact the concept of underreporting had been

introduced by defense counsel in his closing. He argued that Alice was not credible because she allegedly did not mention digital penetration in her initial outcries to her friends.[4]

The judge first gave a supplemental instruction to the jury as follows:

"With regard to [the prosecutor's] argument to you that some domestic abuse victims are too afraid or embarrassed to press charges, this certainly was not the situation here. It was undisputed that [Alice] had vigorously pressed the charges.

"To the extent that her argument might have suggested that [Alice] should somehow be rewarded for having pressed charges, presumably by way of a conviction, even if you were not convinced beyond a reasonable doubt, considering just the evidence of guilt, such a suggestion is totally subversive of our whole system of law . . . .

"To depart from that and to consider extraneous factors such as were suggested is totally destructive of our whole system of protection of — against conviction of innocent persons . . . .

"So, again, I want to stress to you that any appeal to your emotions in that regard by reference to what has been referred to by others, not by anybody here, as to battered wife syndrome, et cetera, or that problem which sometimes does occur, obviously, in some cases, any appeal to your

---

[4]Defense counsel said, "With regard to what happened — and by what happened I mean whether there was penetration — I want you to consider this. We all know — it's common knowledge in this day and age that rape, sexual abuse, sexual assault, they are under-reported crimes. For many reasons very often women don't come forward and report when they have been victimized in a sexual nature. Whether it's because of embarrassment, self-reproach, maybe even fear of what may be perceived as a sexist criminal justice system — for whatever reason, many women don't come forward. But I want you to ask yourselves this question. When a woman does come forward, when she comes forward and complains spontaneously, is she going to report the most egregious thing that happened to her or is she going to report the least egregious thing that happened to her? When she's saying something spontaneously, as [Alice] allegedly was saying something spontaneously in this case, is her complaint going to be about a forceful, painful penetration of a vagina or is it going to be he took my shirt off?"

emotions in that regard is totally excluded from your consideration of this particular case."

In trying to correct his inapposite criticism of the prosecutor, the judge told the jury,

> "I just wanted to correct the record and to apologize to [the prosecutor].
>
> "I did . . . listen to her entire argument on the tape, and I find nothing inappropriate in her argument. So that I unfairly criticized her . . .
>
> "Indeed, I think the issue of under-reporting of sexual abuse was raised by [defense counsel] and not by [the prosecutor].
>
> "But my other remarks remain the same, that you are not to be sidetracked by considering any issues but only — any social issues but only to decide the case on the facts of this case as proved to you or not proved to you."

The judge was correct in telling the jury to decide the case on the facts and not to be sidetracked by considering social issues. The defendant's concern that the jury was preempted from considering his argument that Alice was not credible because she allegedly did not mention penetration is overdrawn. The judge made no reference to the defendant's credibility argument. On the whole his additional remarks, requiring the jury to decide the case on the proven facts and not on extraneous considerations, did not harm the defendant.

*Judgments affirmed.*