COMMONWEALTH *vs.* ANTHONY WILLIAMS.

No. 99-P-1249.

Essex. October 9, 2001. - November 1, 2002.

Present: LENK, COWIN, & McHUGH, JJ.

*Rape. Evidence,* Fresh complaint, Prior consistent statement, Cumulative evidence, Consciousness of guilt. *Practice, Criminal,* Instructions to jury.

At the trial of an indictment charging rape, the judge did not err in admitting various forms of the victim's account of the crime, where, although permitting the victim to testify on direct examination as to what she told a police officer was error, her testimony was terse and devoid of detail, and therefore, it did not create a substantial risk of a miscarriage of justice [341-342]; where the victim's reading of her statement to a second police officer was proper as a prior consistent statement provided before she had a motive to fabricate [342-344]; and where the cumulative impact of admitting all of the victim's accounts was not unfairly prejudicial, given that the judge provided forceful and comprehensive limiting instructions both at the time the testimony was offered and at the end of the trial [344-346].

At a criminal trial, the judge did not err in instructing the jury regarding consciousness of guilt, where, although the judge should not have included the portion of his instruction that suggested that the defendant's flight during a previous trial actually was evidence of his consciousness of guilt, the judge's remarks created no risk of a miscarriage of justice, but simply expressed the intuitively obvious and provided a platform for his thorough, comprehensive, and entirely proper instruction on consciousness of guilt. [346-347]

INDICTMENT found and returned in the Superior Court Department on June 12, 1996.

The case was tried before *William H. Welch,* J., and a motion for a new trial, filed on April 20, 2000, was heard by him.

*Joanne I. DeLong* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

McHUGH, J. Following his indictment for rape, the defendant was tried and convicted.[1] On this appeal, his principal claims of error center on the Commonwealth's use at trial of eight renditions of the victim's account of events, some of which were accompanied by limiting instructions and some of which were not, and on what he claims was the trial judge's erroneous instruction regarding consciousness of guilt. We perceive no error and therefore affirm.[2]

The case turned chiefly on the issue of consent and, to a far

---

[1]The conviction followed the defendant's third trial. The first trial ended in a mistrial resulting from defense counsel's conflict of interest. The second trial produced a hung jury and a second mistrial. The third jury trial, before the judge who presided at the second, promptly followed the second mistrial declaration.

[2]The defendant's appeal from his conviction is consolidated with his appeal from the denial of his motion for a new trial. The new trial motion, filed approximately two years after his conviction, was grounded on alleged prosecutorial misconduct and ineffective assistance of counsel. Factually, the motion asserted that a State police trooper, who testified as a footprint expert, changed his testimony between the second and third trials and that the Commonwealth failed to disclose the upcoming difference before the third trial began. In his careful memorandum, the trial judge found no ineffective assistance. Citing *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998), he also ruled that the claim of misconduct had been waived. He thus looked at that claim solely to determine whether there had been a substantial risk of a miscarriage of justice and concluded that no such risk had occurred. We agree with both conclusions. The alleged change in the testimony had to do with the origin of a "drag mark" in the alley into which the victim claimed the defendant had dragged her before the rape occurred. In the second trial, the trooper testified on cross-examination that the wheel of a nearby shopping cart "possibly" could have made the mark. In the third trial the trooper testified, again on cross-examination, that in his opinion that wheel did not make the mark. The testimony was not elicited by the Commonwealth in either trial, nor did the Commonwealth focus on the subject in summation. The difference in the testimony likely had more to do with the degree of control counsel exerted over the witness than over any changes in his opinion. (In the second trial, the witness seemed primed to offer the same testimony as he did in the third trial, but counsel interposed a new question before he could do so.) At the third trial, defense counsel had the trooper admit that he had done no forensic testing of the wheel or the mark and, thus, could not definitely establish or rule out a link between the two. As a result, counsel's summation on the issue at the end of the third trial differed little from his summation on the same issue at the end of the second. As the trial judge concluded, there was neither ineffective assistance nor a substantial risk of a miscarriage of justice.

lesser extent, on whether penetration had occurred.[3] The Commonwealth presented evidence to the effect that, on the morning the assault occurred, the victim left her house in Beverly after a fight with her boyfriend and went to visit a friend in Salem. She left the friend's house at approximately 3:15 A.M. and, because she had no money for a taxicab, began the approximately six-mile walk home. Shortly thereafter, as she was walking along Bridge Street in Salem, she saw the defendant walking in the opposite direction on the other side of the street. As he saw her, the defendant crossed the street, approached her, and asked if she wanted to smoke "a joint." She declined. Reversing direction, the defendant walked alongside her for a short distance until they reached an alley. Then, grabbing her around the waist and shoulder and telling her he had a knife, the defendant dragged the victim into the alley. He pulled down her trousers and underwear and placed his fingers in her vagina. He then had sexual intercourse with her, apologized for his behavior, and left the alley. The victim waited for a few minutes before running to a nearby pay telephone to call the police.

The defense claimed that the encounter involved sex for money and drugs and that the victim, fearful of her boyfriend's reaction were he to learn of the event, immediately concocted the story of rape. The defendant, who testified at trial, agreed that he and the victim first met each other on Bridge Street. He was out and about that morning because he was attempting to hitchhike somewhere to buy some cocaine. After a brief discussion, he and the victim went into the alley where they smoked his last rock of cocaine. Then, said the defendant, he and the victim agreed that she would have sexual intercourse with him for $17, the money he intended to use for more cocaine and all he had with him at the time. The defendant generally agreed with the victim's account of their sexual contact except that he denied placing his fingers in her vagina and was not certain that

---

[3]The defendant did not maintain that he had not penetrated the victim. Instead, he testified on direct examination that he was "not sure" whether he had.

he actually entered her with his penis.[4]

1. *Evidentiary issues.* As stated, the defendant's first claims of error arise out of the way in which the Commonwealth used at trial the victim's accounts of the early-morning events. Those accounts took various forms. First, the Commonwealth played a tape of the victim's "911" call during its opening statement. It played the tape again during its direct examination of the victim and introduced the tape in evidence. Then, of course, the victim testified at some length about what had happened. During the course of her testimony, she related the content of a statement she gave to Officer William Riley of the Salem police when he appeared on the scene in response to her 911 call. She also read a written statement she gave to Detective Thomas Griffin at the Salem police station ten days after the events occurred and after the defendant had been arrested. That statement was then introduced in evidence. Officer Riley, a nurse from Salem Hospital, and Detective Griffin also testified as to the content of the statements the victim had given them. Officer Riley took the victim's statement very shortly after the events occurred, and the nurse took her statement at the hospital an hour or so after the incident. Detective Griffin took a verbal statement from the victim at the hospital approximately an hour after the nurse took hers and obtained the written statement from the victim at the Salem police station about ten days later.

Including the victim's direct testimony, the jurors thus heard the victim's version of events on eight occasions and carried with them to the jury room the 911 tape and her written statement to Detective Griffin. The trial judge accompanied introduction of all statements, save the 911 tape and the victim's testimony about what she told Officer Riley, with instructions on the limited use of prior consistent statements and of "fresh complaints." The judge also included forceful instructions on

---

[4]The defendant's case was encumbered by a written statement he had given police shortly after his arrest in which he denied any contact with the victim and by a supplemental statement in which he said that he had seen another man in the area at about the time the victim claimed the rape occurred. The defense was also burdened by the defendant's disappearance midway through his first trial, a disappearance that led to issuance of a warrant for his arrest and subsequent steps designed to ensure his presence at all upcoming trials.

both subjects in his final jury instructions. Defense counsel objected only to the victim's reading of her written statement and its introduction in evidence.

Insofar as the various accounts are concerned, the defendant advances three principal claims. First, he argues that it was error for the judge to allow the victim to testify about the content of the statement she gave to Officer Riley. Second, he claims that it was error for the judge to allow the victim to read the statement she gave Detective Griffin and to allow admission of that statement in evidence. Finally, he claims that the overall impact of eight recitations of the victim's account of events, coupled with the two exhibits the jury took with them to the jury room, constituted impermissible and prejudicial "piling on" of the victim's version of what had happened.[5]

a. Treating those contentions in order, the defendant correctly observes that in *Commonwealth* v. *Peters*, 429 Mass. 22, 30 (1999), the Supreme Judicial Court held that the complaining witness should not testify on direct examination about the details of "fresh complaint" statements he or she gave to police or to others. Instead, the court held, "testimony as to the details of the complaint should be left to the fresh complaint witness who heard the complaint." *Ibid.*[6]

However much on point, *Peters* is of no assistance to the defendant here. Assuming, without deciding, that *Peters* applies retroactively, but see *Commonwealth* v. *Peters*, 429 Mass. at 30 ("Judges, therefore, should make sure in future cases that [the *Peters*] principles are applied"), the defendant did not object to

---

[5]He also asserts that admission of the contents of the 911 call was error. There was no objection to the admission of this evidence, and the record supplies a foundation for admitting those contents as an excited utterance. See, e.g., *Commonwealth* v. *Brown*, 46 Mass. App. Ct. 279, 281-282 (1999), *S.C.*, 47 Mass. App. Ct. 616, *S.C.*, 431 Mass. 772 (2000). When a general objection is made to the admission of evidence, the ruling of the trial judge is affirmed if it is supportable on any ground. *G.E.B.* v. *S.R.W.*, 422 Mass. 158, 168-169 (1996). The same rule should apply, a fortiori, when no objection is made. In any event, the contents of the call had some potential value to the defendant, and the admission of this evidence created no substantial risk of a miscarriage of justice.

[6]The court also said that the Commonwealth could explore those details on redirect examination if defense counsel delved into them on cross-examination. *Commonwealth* v. *Peters,* 429 Mass. at 30.

the victim's testimony about what she told Officer Riley. We therefore look at her testimony to see whether it produced a substantial risk of a miscarriage of justice. *Commonwealth* v. *Wentworth,* 53 Mass. App. Ct. 82, 90, 92 (2001). It did not. Her testimony, like her statement to Officer Riley itself, was terse and devoid of detail. She did testify that she told him she had been penetrated, but penetration, while not conceded, was not a focal point of the defense. See note 3, *supra.* Moreover, the victim included in her testimony that she initially identified someone other than the defendant as her assailant and defense counsel skillfully exploited that statement in attacking her credibility.[7]

b. The defendant next contends that it was error for the trial judge to permit the victim to read the written statement she gave to Detective Griffin and to allow introduction of that statement in evidence. By way of foundation, the Commonwealth introduced evidence that Detective Griffin took an initial statement from the victim at the hospital ·a few hours after the incident. Believing that she was then too upset to give him a full and completely detailed account of what happened, however, he asked her about ten days later to come to the police station so he could talk with her further. She agreed. When she arrived, Detective Griffin asked her to look at some items of clothing he had retrieved from the apartment of the defendant. By then, the defendant had been arrested, a fact of which the victim was unaware. After she viewed the garments, Detective Griffin asked her to go into a room by herself and write out a complete account of what had occurred. She complied and ultimately read the resulting statement at trial.

---

[7]The victim's testimony was not accompanied by an instruction dealing with fresh complaint. The victim talked to Officer Riley only a few minutes after the incident and at a time when, according to the officer's trial testimony, she was crying and shaking. Her statement, therefore, likely qualified as an excited utterance admissible substantively without limitation. See *Commonwealth* v. *McCutcheon,* 51 Mass. App. Ct. 715, 720-721 (2001); *Commonwealth* v. *Davis,* 54 Mass. App. Ct. 756, 761-762 (2002). Even if it was not, the judge gave a forceful limiting instruction when Officer Riley testified about the same statement, and the statement itself was far less detailed than the other statements the jury heard. Consequently, no substantial risk of a miscarriage of justice accompanied the omission of any limiting instruction circumstances might have required.

The Commonwealth tendered that statement during the course of the victim's direct examination. At a sidebar conference, the judge, who only days earlier had presided over the trial ending in the second mistrial, ruled that, in light of defense counsel's likely exploration of the way in which the victim's in-court testimony diverged from accounts she had given on the 911 tape to Officer Riley, to the nurse, and to Detective Griffin at the hospital, the written statement was a prior consistent statement provided before she had a motive to fabricate. Secondarily, he said, it was a fresh complaint. He nevertheless ruled that the Commonwealth could only introduce the statement on redirect examination, presumably so that he could be certain that defense counsel's anticipated exploration of inconsistencies in fact materialized. See generally *Commonwealth* v. *Saarela*, 376 Mass. 720, 722-723 (1978); *Commonwealth* v. *Martinez*, 425 Mass. 382, 397 (1997).

Cross-examination of the victim did indeed highlight inconsistencies between her in-court testimony and her initial accounts of what happened. Among other things, defense counsel focused on her initial statements to the effect that she had removed her trousers and underwear before the intercourse and her in-court testimony that the defendant had removed those garments. He also explored her statement on the 911 tape to the effect that someone had "tried" to rape her and her later statements that rape had in fact occurred. Those differences, of course, were material to a case in which consent was the principal defense and in which penetration was not conceded.

The trial judge has broad discretion to admit or exclude evidence, and his or her rulings on such matters will be reversed only when that discretion is abused. See *Commonwealth* v. *Andrews*, 403 Mass. 441, 454-455 (1988). The judge did not abuse his discretion here. The differences between the victim's testimony at the trial and her initial versions of events, although differences of detail and not of theme, bore heavily on the issue of consent. The written statement was consistent with the victim's trial testimony and consequently had the capacity to affect the jury's perception of her credibility. See generally *Commonwealth* v. *McCormick*, 48 Mass. App. Ct. 106, 111-112 (1999).

It is true that prior consistent statements are generally admissible only if made before there was a motive to fabricate, *Commonwealth* v. *Binienda*, 20 Mass. App. Ct. 756, 759-760 (1985); *Commonwealth* v. *Lareau*, 37 Mass. App. Ct. 679, 683-684 (1994), and that the motive claimed by the defendant to fabricate in this case arose as soon as the sexual encounter ended.[8] We have said on prior occasions, however, that the requirements for admitting such statements are not to be applied mechanically. See *Commonwealth* v. *Kindell*, 44 Mass. App. Ct. 200, 203 (1998). "[T]he test should remain one of probative value — whether the prior consistent statement has a logical tendency to meet and counter the suggestion that the witness has recently contrived [her] testimony for purposes of trial." *Commonwealth* v. *Darden*, 5 Mass. App. Ct. 522, 530 (1977). See *Commonwealth* v. *Knight*, 437 Mass. 487, 497 (2002). Even accepting the defendant's theory as to when the alleged motive to fabricate arose, the statement was relevant to show that the victim had not puffed up her initial claims on the eve of trial to make them more credible or to smooth over some of the rough spots her original versions contained.

c. Finally, the defendant contends that even if admission of each of the victim's accounts was appropriate when viewed in isolation, the cumulative impact of admitting all of those accounts was unfairly prejudicial. As we have said a number of times, " '[R]epetitive testimony from several witnesses regarding the details of the complaint may lend undue credibility to the complainant's testimony' and judges should, therefore, exercise caution in permitting fresh complaint testimony from numerous witnesses. *Commonwealth* v. *Licata*, 412 Mass. 654, 659-660 (1992). The risk of such 'piling on' of evidence is that a 'jury will use the details of the fresh complaints as substantive evidence that the crime actually occurred.' *Commonwealth* v.

---

[8]As a matter of practice, the theory advanced by the party opposing introduction of the statement often is used as a basis for deciding when the motive to fabricate arose. The trial judge, however, need not accept that theory uncritically. See generally, e.g., *Commonwealth* v. *Haywood*, 377 Mass. 755, 762-763 (1979). Indeed, in many cases it may be difficult to determine precisely when the motive in fact arose. See *Commonwealth* v. *Healey*, 27 Mass. App. Ct. 30, 37 & n.8 (1989).

*Lavalley,* 410 Mass. 641, 646 (1991)." *Commonwealth* v. *Swain,* 36 Mass. App. Ct. 433, 442 (1994).

Limiting instructions at the time the testimony is offered and again at the end of trial are the primary antidotes to the possibility of improper use. See *Commonwealth* v. *Licata, supra* at 660; *Commonwealth* v. *Trowbridge,* 419 Mass. 750, 761 (1995). More, though, is often required. Evidence of fresh complaints is admitted solely to rebut the inference of fabrication thought to arise in the absence of the victim's prompt "hue and cry." See *Commonwealth* v. *Mazzone,* 55 Mass. App. Ct. 345, 350 (2002). In deciding whether to admit or exclude statements of fresh complaint, therefore, the trial judge must be informed by the specific role each proffered statement plays in rebutting any such inference the statement's absence might reasonably produce and that statement's incremental value, i.e., the legitimate, as opposed to unfairly prejudicial, weight the statement adds to the rebuttal when considered in the context of any fresh complaint evidence previously admitted. See generally *Commonwealth* v. *Brown,* 389 Mass. 382, 386 n.7 (1983); *United States* v. *Beechum,* 582 F.2d 898, 914 (5th Cir. 1978), cert. denied, 440 U.S. 920 (1979) ("It is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice").[9] For our part, although we scrutinize with care cases in which a seemingly excessive number of witnesses testify as to fresh complaints, *Commonwealth* v. *Aspen,* 53 Mass. App. Ct. 259, 268 (2001), and although in so doing we sometimes appear to look chiefly at numbers, see, e.g., *Commonwealth* v. *Swain, supra; Commonwealth* v. *Lorenzetti,* 48 Mass. App. Ct. 37, 42 (1999), our judgment in the end turns as it must on our assessment of whether the trial judge has struck a balance within the ambit of his or her considerable discretion. See *Commonwealth* v. *Morais,* 431 Mass. 380, 385-386 (2000).

---

[9]In that regard, the defendant's point cannot be finessed simply by looking at the basis for admitting each of the separate statements and segregating for isolated analysis only those statements admitted solely as fresh complaints. As we said recently, in deciding whether evidence of fresh complaint amounts to unfair and inappropriate "piling on," it is necessary to look not only at the "fresh complaint" evidence but also at any other evidence of contemporaneous complaints regardless of the basis on which the evidence was admitted. See *Commonwealth* v. *Davis,* 54 Mass. App. Ct. 756, 764-765 (2002). But see *Commonwealth* v. *Santiago,* 437 Mass. 620, 623-628 (2002).

Here the trial judge's contemporaneous instructions were forceful and comprehensive, and his instructions at the end were of like quality. The statements in question were those the victim made to summon aid and then to the first three people she encountered as the aid progressively arrived. Her silence as she encountered any one of the three or her omission of details in her discussions with them may well have produced precisely the kind of inference the Commonwealth was entitled to rebut. What the victim said to each of those people in the event's immediate aftermath, her demeanor as she talked to them, and the presence or absence of differences in the details of what she said were entirely appropriate components of the Commonwealth's rebuttal effort. There was no inappropriate "piling on," and the judge did not abuse his discretion in admitting the evidence.

2. *Instruction on consciousness of guilt.* The defendant's final claim is that the trial judge erred in his instruction regarding consciousness of guilt. During its cross-examination of the defendant, the Commonwealth elicited testimony that he had fled during the course of his first trial and had not returned until arrested under the warrant his flight engendered. He testified that he had fled because his lawyer at the time had told him he stood no chance of winning the case.

At the end, the Commonwealth then sought an instruction on the defendant's flight as consciousness of guilt. Without objection, the judge agreed to give such an instruction. During the course of his instructions, the judge introduced the topic by telling the jury that the defendant "did not show up at trial when he was supposed to" and that the defendant's failure was "contrary to the law. You have to show up." Ending his introduction, he told the jury that the defendant had been arrested for not appearing and that the evidence relating to his flight and apprehension was "what is called evidence of, quote, 'consciousness of guilt.' " The judge then proceeded to give an instruction that fully complied with every recommendation contained in *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982).

The defendant claims that the quoted portions of the judge's introduction suggested that the defendant's flight actually was

evidence of his consciousness of guilt. But no objection was taken at the time, and looking at the charge as a whole, we perceive no substantial risk of a miscarriage of justice. See *Commonwealth* v. *Henry*, 37 Mass. App. Ct. 429, 434-435 (1994). It might have been preferable to omit the introduction and simply to have said something to the effect that there had been evidence of the defendant's failure to return to his earlier trial and his subsequent arrest. See generally *Commonwealth* v. *Knap*, 412 Mass. 712, 715-716 (1992). In the last analysis, however, the judge's preliminary remarks simply expressed the intuitively obvious and provided a platform for his thorough, comprehensive, and entirely proper instruction on consciousness of guilt. No risk of miscarriage of justice resulted.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*